## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JADEN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:20-cv-00478-NT |
| | ) | |
| CUMBERLAND COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER ON DEFENDANTS' MOTION TO DISMISS

Plaintiff Jaden Brown alleges that the Defendants[1] violated her rights under the U.S. Constitution and Maine law when they handcuffed her when she was thirty-five weeks pregnant and when officers were present in the hospital delivery room when she gave birth to her child. The Defendants have moved to dismiss all claims (ECF No. 8). For the reasons set forth below, the Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND[2]

In July of 2018, Ms. Brown—who had an outstanding warrant of arrest for a probation violation—turned herself in at the Cumberland County Jail ("**CCJ**"). Compl. ¶¶ 30–31 (ECF No. 1). She was sentenced to fifteen months on the probation

---

[1]    The Plaintiff names seven defendants: Cumberland County; Kevin Joyce, the sheriff of Cumberland County; Timothy Kortes, the head administrator of the Cumberland County Jail ("**CCJ**"); and Mark Renna, Sam Dickey, Deputy Brady, and Deputy Haskell, all corrections officers at CCJ. Compl. ¶¶ 7, 14, 20, 22, 24, 26 (ECF No. 1).

[2]    The facts below are drawn from the allegations in the Complaint, which I take as true for the purposes of deciding a motion to dismiss. *Maloy v. Ballori-Lage*, 744 F.3d 250, 251 (1st Cir. 2014) (citing *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013)).

violation. Compl. ¶ 32. Ms. Brown was pregnant when she turned herself in, and the Defendants were aware of her pregnancy during the entire time relevant to this Complaint. Compl. ¶¶ 33, 41.

At some point before December of 2018, Ms. Brown was transferred to the Prerelease Center, which is across the parking lot from the main building at CCJ. Compl. ¶¶ 34–35. On December 29 or 30, 2018, Ms. Brown was transferred back to the main jail building.[3] Compl. ¶¶ 37, 39, 42. Ms. Brown states that she did not pose a safety or security risk to anyone. Compl. ¶ 44. Defendant Mark Renna, a corrections officer at CCJ, was tasked with taking Ms. Brown back to the main jail from the Prerelease Center. Compl. ¶ 42. Defendant Renna handcuffed Ms. Brown—who at the time was thirty-five weeks along in her pregnancy and visibly pregnant—and walked with her across the parking lot. Compl. ¶¶ 40, 43.

Defendant Renna later realized he had violated jail policy[4] by handcuffing a pregnant inmate, and he reported the matter to his supervisor, Lieutenant William Brady. Compl. ¶¶ 46–47. Lieutenant Brady failed to report the incident to his supervisors and signed off on a report of Ms. Brown's transfer that failed to note that handcuffs were used.[5] Compl. ¶ 48. According to Ms. Brown, Defendant Kevin Joyce, the sheriff of Cumberland County, was not made aware of the incident until February

---

[3]     Ms. Brown alleges that other inmates in the Prerelease Center complained to corrections officers that she was threatening to turn them in for using drugs. Compl. ¶ 37. Ms. Brown denies threatening other inmates and states that she in fact had reported other inmates for using drugs at the Prerelease Center. Compl. ¶ 38.

[4]     The Plaintiff avers that Defendant Renna also violated a Maine statute, 30-A M.R.S. § 1582, but that he was unaware of that violation. Compl. ¶¶ 45, 47.

[5]     Lieutenant Brady is not named as a defendant.

of 2019, when Plaintiff's counsel informed him. Compl. ¶ 49. The Plaintiff alleges that this was not the first time that deputies and supervisory staff at CCJ had handcuffed a pregnant inmate in violation of Maine law. Compl. ¶ 50.

Ms. Brown went into labor on February 11, 2019, and she was transported from CCJ to Maine Medical Center to give birth. Compl. ¶¶ 51–52. Throughout her twenty-hour labor, CCJ corrections officer were present in the labor and delivery room, even though Ms. Brown posed no escape or security risk and medical professionals had not asked them to be present. Compl. ¶¶ 54–55. Corrections officers from the jail were freely coming and going from Ms. Brown's room, using their cell phones, drinking coffee, and joking that Ms. Brown should name her child after the jail. Compl. ¶ 58. Defendants Deputy Dan Haskell, Deputy Sam Dickey, and Deputy Carrie Brady[6] were all present in the labor and delivery room at some point, and Deputies Brady and Dickey were in the room when Ms. Brown's child was born and saw both Ms. Brown's and her child's naked and exposed bodies. Compl. ¶¶ 56–57, 59.

The Plaintiff asserts that the presence of the corrections officers in her labor and delivery room violated state law and that Defendants Joyce and Kortes have admitted the violation. Compl. ¶¶ 60, 62. According to the Plaintiff, Sheriff Joyce is the chief policy maker for the Cumberland County Sheriff's Department, and he is responsible for training and supervising Defendants Dickey, Brady, Haskell, and Renna. Compl. ¶ 63. The Plaintiff alleges that Sheriff Joyce failed to either train or

---

[6]    Deputies Haskell and Dickey are male corrections officers, and Deputy Brady is a female corrections officer, not to be confused with Lieutenant Brady. Compl. ¶¶ 24, 26; *see* Def.'s Mot. 9.

supervise the Defendants as they were acting in their capacity as corrections officers. Compl. ¶ 64. Major Timothy Kortes is a policy maker for the Cumberland County Sheriff's Department and is also responsible for training and supervising the identified corrections officers, duties that the Plaintiff alleges he failed to fulfill. Compl. ¶¶ 14, 65–66. Finally, the Plaintiff asserts that Cumberland County also failed to train and supervise correctional officers and that the county has a pattern and practice of failing to adequately train and supervise officers. Compl. ¶¶ 67–68.

The Plaintiff states that as a result of the Defendants' actions, she suffered anxiety, embarrassment, shame, and degradation. Compl. ¶ 69. She has brought eleven claims against the Defendants. In Count I, she alleges that the Defendants engaged in concert to violate her constitutional rights by covering up violations by Officer Renna and by failing to train and supervise officers on their treatment of pregnant inmates. Compl. ¶¶ 70–74 (asserting claim pursuant to 42 U.S.C. § 1985). Counts II, III, IV, and V assert § 1983 claims against Defendants Renna, Dickey, Brady, and Haskell, respectively, alleging that the corrections officers violated the Plaintiff's Eighth and Fourteenth Amendment rights. Compl. ¶¶ 75–114. In Counts VI, VII, and VIII, the Plaintiff asserts § 1983 claims against Sheriff Joyce, Major Kortes, and Cumberland County for violating her constitutional rights, and she alleges that those constitutional violations stemmed from the Defendants' grossly negligent policies and customs and their deliberate, reckless, or callous indifference to her constitutional rights. Compl. ¶¶ 115–28.

4

The Plaintiff also brings three state-law claims against the Defendants.[7] In Count IX, the Plaintiff asserts that the Defendants violated 30-A M.R.S. § 1582 when she was handcuffed while pregnant. Compl. ¶¶ 136–40. In Count X, the Plaintiff asserts a claim for civil conspiracy, alleging that the Defendants acted in concert to commit the unlawful acts through unlawful means and in bad faith. Compl. ¶¶ 132–35. Finally, in Count XI, the Plaintiff alleges that the Defendants violated the Maine Civil Rights Act ("**MCRA**"), 5 M.R.S. § 4682, by intentionally attempting to interfere with the Plaintiff's exercise and enjoyment of her rights. Compl. ¶¶ 129–30.

The Defendants moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6) on March 31, 2021 (ECF No. 8). They argue that the individual officers are entitled to qualified immunity; that the Plaintiff fails to state a claim for supervisory liability against Sheriff Joyce and Major Kortes and for municipal liability against Cumberland County; that there is no private right of action under 30-A M.R.S. § 1582; and that the Plaintiff has not stated a claim for civil conspiracy under 42 U.S.C. § 1985(3) or any other law.

## LEGAL STANDARD

A court reviewing a motion to dismiss under Rule 12(b)(6) follows two steps. First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citing *Ocasio-*

---

[7]     The state-law claims are not in numerical order in the Complaint but are identified here based on the numbers assigned to them.

*Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)). Second, the court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Id.* (citing *Ocasio-Hernández*, 640 F.3d at 12).

## DISCUSSION

### I.   Qualified Immunity

The Defendants argue that the individual officers are entitled to qualified immunity both for handcuffing the Plaintiff while she was pregnant and for being present in the hospital delivery room when the Plaintiff gave birth to her child. Thus, they seek the dismissal of Counts II, III, IV, and V which assert § 1983 claims against Defendants Renna, Dickey, Brady, and Haskell.

The U.S. Supreme Court has long held that "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 517 (1st Cir. 2016) (applying standard at motion to dismiss stage). Within this second prong—the "clearly established" inquiry—the First Circuit recognizes two elements. *Castagna v. Jean*, 955 F.3d 211, 219–20 (1st Cir. 2020). The first element "focuses on the clarity of the law at the time of the violation," while the second "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's

constitutional rights." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)).

The central question in the "clearly established inquiry" is whether "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotations omitted). The legal principle at issue "must have a sufficiently clear foundation in then-existing precedent," and it must be "dictated by controlling authority or a robust consensus of cases of persuasive authority"—not just "suggested" by precedent. *Id.* at 589–90 (internal quotations omitted). This is a "demanding standard" that "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It "requires a high 'degree of specificity,' " meaning that the legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590 (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)). Still, officers can "be on notice that their conduct violates established law even in novel factual circumstances," *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)), and the Supreme Court and circuit courts have held "that cases involving materially similar facts are not necessary to a finding that the law was clearly established," *id.* at 77 (collecting cases); *see also id.* at 76 (explaining that "[a] 'robust consensus' does not require the express agreement of every circuit" and that "sister circuit law [can be] sufficient to clearly establish a proposition of law when it would provide notice to every reasonable officer that his conduct was unlawful").

7

Questions involving qualified immunity should be resolved "at the earliest possible stage in litigation," *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)), and thus in some cases, this defense "can be raised and evaluated on a motion to dismiss," *id.* (citing *Siegert v. Gilley*, 500 U.S. 226, 232–33 (1991)); *see also Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").

Nevertheless, "[t]he plausibility standard creates tension at this stage of litigation between developing the requisite facts for a well-informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery." *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (citing *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996)). Under the motion-to-dismiss standard, a court must scrutinize "the defendant's conduct *as alleged in the complaint* . . . for objective legal reasonableness." *Behrens*, 516 U.S. at 309 (internal quotations omitted).

## A.     Handcuffing of Ms. Brown

The Plaintiff asserts that, when she was thirty-five weeks pregnant, Defendant Renna handcuffed her to walk her across the parking lot from the Prelease Center back to the main jail. Compl. ¶¶ 40, 42–43. She contends that this action violated her rights under the Eighth and Fourteenth Amendments, framing the latter as a

violation of her due process rights, Compl. ¶¶ 76–77, and she notes that it also constituted a violation of 30-A M.R.S. § 1582, Compl. ¶ 45.

The Defendants argue that the Plaintiff has failed to establish both prongs of the qualified immunity test with regard to this incident, but I sidestep whether the Defendant Renna's conduct violated the Plaintiff's constitutional rights[8] because I ultimately find that a reasonable officer would not have understood that his conduct violated the Plaintiff's constitutional rights in the circumstances that Defendant Renna faced. *See Rivera-Corraliza v. Morales*, 794 F.3d 208, 215 (1st Cir. 2015) (judges are free to jump to the "clearly established" step).

On the "clearly established" prong, the Defendants assert that "[t]here is no case law that clearly establishes" that it is unlawful to handcuff a pregnant inmate who is not in labor for a short walk across a parking lot. Defs.' Mot. 6. In the cases where courts have held that the handcuffing of a pregnant inmate was unconstitutional, the inmate was restrained during or immediately after labor. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1252–54 (9th Cir. 2016) (collecting cases discussing the dangers of restraining inmates when they are in labor); *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 574 (6th Cir. 2013) (concluding that "the shackling of pregnant detainees while in labor offends contemporary standards of

---

[8]      In order to show that a defendant has violated the Eighth Amendment, a plaintiff must demonstrate that (1) the alleged conduct is "objectively, sufficiently serious"; and (2) that the prison official had a "sufficiently culpable state of mind," meaning "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To show that the defendant has violated the plaintiff's substantive due process rights under the Fourteenth Amendment, the plaintiff generally "must allege facts 'so extreme and egregious as to shock the contemporary conscience.'" *Abdisamad v. City of Lewiston*, 960 F.3d 56, 59–60 (1st Cir. 2020) (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005)); *see also Coyne v. Cronin*, 386 F.3d 280, 287–89 (1st Cir. 2004).

human decency such that the practice violates the Eighth Amendment's prohibition against the 'unnecessary and wanton infliction of pain'—i.e., it poses a substantial risk of serious harm"); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534 (8th Cir. 2009) (holding that existing Supreme Court and lower court precedent "would have made it sufficiently clear to a reasonable officer . . . that an inmate in the final stages of labor cannot be shackled absent clear evidence that she is a security or flight risk"); *Remlinger v. Lebanon Cnty.*, No. 1:18-CV-00984, 2020 WL 3104008, at *4–5 (M.D. Pa. June 11, 2020) (denying motion to dismiss and rejecting defendants' argument that it did not violate any clearly established right to shackle a pregnant inmate throughout labor and immediately after emergency C-section); *Brawley v. Washington*, 712 F. Supp. 2d 1208, 1219–21 (W.D. Wash. 2010) (denying defendants' summary judgment motion because plaintiff showed she was exposed to an unnecessary risk of harm when she was shackled during and immediately after labor); *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 877 F. Supp. 634 (D.D.C. 1994) (holding that shackling a woman "in labor and shortly thereafter . . . is inhumane"), *vacated in part and modified in part*, 899 F. Supp. 659 (D.D.C. 1995).

While it may be clearly established that handcuffing a pregnant woman who is in labor violates the woman's constitutional rights, that is not what the Plaintiff has alleged here. A court must "inquire whether a reasonable defendant would have understood whether his particular conduct violated Plaintiff's rights." *Cosenza v. City of Worcester*, 355 F. Supp. 3d 81, 96 (D. Mass. 2019) (citing *Ashcroft v. Al-Kidd*, 563

U.S. 731, 742 (2011) (instructing courts "not to define clearly established law at a high level of generality")). The key question is "whether the violative nature of particular conduct is clearly established." *Al-Kidd*, 563 U.S. at 742. Here, the Plaintiff does not identify a single case in which a court has held that it was unconstitutional to handcuff a pregnant woman who is not in labor or immediately post-partum.[9]

The Plaintiff emphasizes that state law prohibits the practice of handcuffing pregnant inmates. Section 1582 provides:

> A jail may not use restraints on a prisoner or juvenile known to be pregnant, including during transport to a medical facility or birthing center, labor, delivery and postpartum recovery, unless the jail administrator or the designee of the jail administrator makes a determination that the prisoner or juvenile presents an extraordinary circumstance as described in subsection 2.

30-A M.R.S. § 1582(1). Subsection 2 then identifies limited scenarios in which restraints may be used on pregnant inmates, and subsection 3 sets forth the procedures—including written documentation—that must be followed when such restraints are used. The Plaintiff alleges that none of the circumstances spelled out in § 1582(2) were present when she was handcuffed, Compl. ¶ 138, and she suggests that no written documentation was made, Compl. ¶ 48.

---

[9]    Although certain conduct can violate clearly established law even where no precise precedent exists, courts typically reach such a conclusion when reviewing conduct that is inherently cruel and "antithetical to human dignity." *Hope v. Pelzer*, 536 U.S. 730, 745–46 (2002). At least one court has held that there is "obvious cruelty inherent in" the practice of shackling "an inmate in the final stages of labor" and that the practice is "both degrading and dangerous." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534 (8th Cir. 2009) (internal quotations omitted). And the cases involving the shackling of women immediately before and during labor have also detailed the severe injuries that have resulted from the practice, including permanent hip injury, torn stomach muscles, an umbilical hernia, and injured and deformed hips. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1253 (9th Cir. 2016) (explaining that "shackling women in labor exposes them to a risk so serious that it amounts to a constitutional violation").

While a violation of state law, may "bolster[] the plaintiff's argument . . . that 'a reasonable officer in the officer's circumstances would have believed that his conduct violated the Constitution . . .' " it "does not, in and of itself, establish a constitutional violation." *Irish*, 979 F.3d at 77 (quoting *Stamps v. Town of Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016)). Without case law that establishes widespread acceptance of a federal constitutional right, state law is not enough. *See Lopera v. Town of Coventry*, 652 F. Supp. 2d 203, 216 (D.R.I. 2009) (explaining that state law cannot "determine whether federal law was clearly established"); *see also Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Goyco de Maldonado v. Rivera*, 849 F.2d 683, 687–88 (1st Cir. 1988).

For these reasons, Deputy Renna is entitled to qualified immunity, and Count II is dismissed.

### B.    Officers in the Hospital Delivery Room

Defendants Haskell, Dickey, and Brady also claim that they are entitled to qualified immunity. The Plaintiff alleges that these deputies violated her constitutional rights by being present in the delivery room and observing the birth of her child without her permission when she posed no security risk and when medical personnel had not requested their presence. Compl. ¶¶ 59–61. In her Complaint, she tethers these counts to a violation of her Eighth and Fourteenth Amendment rights, but she invokes her Fourth Amendment right to privacy in her opposition to the

motion to dismiss.[10] Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss ("**Pl.'s Opp'n**") 7–8 (ECF No. 22).

For these three deputies, the Defendants focus their argument on the second prong of the qualified immunity test. They assert that it was not clearly established that it was unlawful for the officers to be present during the birth of the Plaintiff's child. Defs.' Mot. 9–10. They contend that there is no Supreme Court, First Circuit, or sister circuit precedent for such a position, and they argue that cases involving strip searches or body cavity searches—including in the presence of officers of the opposite sex—are distinguishable and would not have put officers in this case on notice that their presence in the delivery room was unlawful. Defs.' Mot. 9–11.

In response, the Plaintiff argues that the "Defendants' reliance on the strip-search line of cases is instructive, but not the final inquiry" because these cases "explain the circumstances under which the right to privacy can be reasonably infringed when balanced with legitimate penological interests." Pl.'s Opp'n 7. The Plaintiff then suggests that I should balance the loss of the Plaintiff's privacy against any legitimate penological needs, emphasizing that there was no emergency situation and that her body was repeatedly exposed during the prolonged delivery. Pl.'s Opp'n 9. She argues that her privacy interests were infringed by the presence of corrections officers in the delivery room during a time when she was naked and vulnerable. To support her claim, she relies primarily on a First Circuit opinion which involved strip

---

[10]     The Complaint elsewhere asserts a violation of the Plaintiff's Fourth Amendment rights. *See* Compl. ¶ 1.

searches of male inmates that were conducted in response to a prison riot and were supervised by a female corrections officer. *See* Pl.'s Opp'n 9 (citing *Cookish v. Powell*, 945 F.2d 441, 447 (1st Cir. 1991)). Although the Plaintiff appears to concede that "the caselaw has not addressed this specific fact-pattern," she asserts that the case law puts the Defendants on notice that the Fourth Amendment itself confers privacy interests on inmates and "delineates the ways in which that privacy interest can be curtailed consistent with the interests of incarceration." Pl.'s Opp'n 10. Finally, the Plaintiff reiterates that the Defendants' conduct was prohibited by state statute. Pl.'s Opp'n 10 ("It does not pass the straight-face test that Defendants were unaware that they were in direct violation of the Constitution's right to privacy with the existence of a statute specifically on point with respect to the conduct of their chosen profession.").

In *Cookish*,[11] the First Circuit recognized that individuals—including prisoners—retain a right to privacy[12] in their bodies and have a right to shield their

---

[11]     *Cookish v. Powell* involved strip searches of male inmates conducted after a prison riot that were supervised by a female prison guard. *See generally* 945 F.2d 441 (1st Cir. 1991). In holding that the corrections officers were entitled to qualified immunity, the First Circuit focused on "the official's reasonable, although mistaken, conclusion regarding the existence of an emergency permitting a visual body cavity search although conducted within the visual range of a prison guard of the opposite sex." *Id.* at 449.

[12]     While the First Circuit seems to have rooted this right to privacy in the Fourth Amendment, other courts have rooted it elsewhere. *See Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 757 n.26 (6th Cir. 2004) (collecting cases). Some describe it as a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *See Blanco v. Cnty. of Kings*, 142 F. Supp. 3d 986, 996 (E.D. Cal. 2015) (citing *York v. Story*, 324 F.2d 450 (9th Cir. 1963)). Others have held that it originates in the Fourth Amendment's prohibition of unreasonable searches and seizures. *See Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992). Still others have found that an inmate's Eighth Amendment rights can be implicated when she is forced to expose her body to guards of the opposite sex. *See Jordan v. Gardner*, 986 F.2d 1521, 1531 (9th Cir. 1993) (en banc) (holding that a cross-gender clothed body search policy at a women's prison constituted cruel and unusual punishment because many of the inmates had histories of sexual or physical abuse by men and because cross-gender bodily searches, even if conducted properly, would likely inflict psychological trauma); *Kent v. Johnson*, 821 F.2d 1220, 1227–

---

14

naked bodies from view from members of the opposite sex. *See* 945 F.2d at 447. The First Circuit found that "the trend, if not the clearly established law, was that an inmate's constitutional right to privacy is violated when guards of the opposite sex regularly observe him/her engaged in personal activities, such as undressing, showering, and using the toilet." *Id.* at 446. Summarizing the state of the law as of October 1987, the First Circuit stated that:

> (1) inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment and (2) if the observation was other than inadvertent, occasional, casual, and/or restricted, such observation would (in all likelihood) violate the Fourth Amendment, *except* in an emergency condition.

*Id.* at 447.

Other circuits have reached similar conclusions. *See Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 757 (6th Cir. 2004) ("Our court has recognized that a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners." (internal quotations omitted)); *Hill v. McKinley*, 311 F.3d 899, 903–04 (8th

---

28 (6th Cir. 1987) (holding that plaintiff sufficiently alleged a violation of his Eighth Amendment rights where he alleged "that female prison guards have allowed themselves unrestricted views of his naked body in the shower, at close range and for extended periods of time, to retaliate against, punish and harass him for asserting his right to privacy"). The Plaintiff has referenced all three constitutional amendments in her Complaint. *See Semelbauer v. Muskegon Cnty.*, No. 1:14-cv-1245, 2015 WL 9906265, at *3–4 (W.D. Mich. Sept. 11, 2015) (permitting plaintiff to proceed on separate claims that the viewing of female inmates by male guards violated both her Fourth and Eighth Amendment rights).

Cir. 2002) (holding that prisoner's "Fourth Amendment rights were violated when the defendants allowed her to remain completely exposed to male guards for a substantial period of time after the threat to security and safety had passed"); *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) ("[P]risoners do retain a limited constitutional right to bodily privacy, particularly as to searches viewed or conducted by members of the opposite sex."); *Strickler v. Waters*, 989 F.2d 1375, 1387 (4th Cir. 1993) ("[W]e have held that, when not reasonably necessary, exposure of a prisoner's genitals to members of the opposite sex violates his constitutional rights." (citing *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981))); *Michenfelder v. Sumner*, 860 F.2d 328, 333–34 (9th Cir. 1988) ("Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity.").

Still other courts have found that, regardless of the gender of the parties, it is clearly established "that, absent a legitimate reason, individuals maintain a right to bodily privacy, in particular the right not to have their genitals exposed to onlookers." *Mitchell v. Stewart*, 608 F. App'x 730, 735 (11th Cir. 2015); *see also Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013) (stating that gender "is just one fact for the court to consider" and suggesting that other facts include whether others were able to view the inmate's body, the humiliating nature of the strip search, and whether the search was reasonably related to a legitimate penological interest). Put another way, "gratuitous invasions of privacy violate the Fourteenth Amendment." *Hydrick v. Hunter*, 500 F.3d 978, 1000 (9th Cir. 2007) (citations

omitted), *vacated and remanded on other grounds*, 556 U.S. 1256 (2009); *see also Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 530 (6th Cir. 2016). "[S]trip searches performed in view of other inmates without a legitimate penological justification violate[ ] inmates' clearly established" constitutional rights); *Riley v. Glover*, No. 4:17-cv-00234-CDL-MSH, 2019 WL 1338911, at *3 (M.D. Ga. Mar. 4, 2016) (denying motion to dismiss on qualified immunity grounds where plaintiff alleged that the defendant forced him to walk through a prison with his genitals exposed). And because assessing whether an invasion of privacy is "gratuitous" is a "highly factual inquiry," dismissal on qualified immunity grounds is often not appropriate at the motion to dismiss stage. *James v. Lee*, 485 F. Supp. 3d 1241, 1260 (S.D. Cal. 2020).

Although the Plaintiff has not cited a case holding that the right to privacy extends to the circumstances of labor, officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Irish*, 979 F.3d at 76 (quoting *Hope*, 536 U.S. at 741). The key question is whether the "contours" of the right "were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)). This means that, in the "obvious case," there need not be a materially similar case for the right to be clearly established. *See Wesby*, 138 S. Ct. at 582 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020).

As discussed above, where there is a broad consensus in the case law, the fact that the specific conduct also constitutes a violation of state law can "bolster[ ] the

17

plaintiff's argument . . . that 'a reasonable officer in the officer's circumstances would have believed that his conduct violated the Constitution." *Irish*, 979 F.3d at 77 (quoting *Stamps*, 813 F.3d at 32 n.4). Maine law provides that "[w]hen a prisoner or juvenile is admitted to a medical facility or birthing center for labor or childbirth, a corrections officer may not be present in the room during labor or childbirth unless specifically requested by medical personnel." 30-A M.R.S. § 1582(4) (adding that, "[i]f a corrections officer's presence is requested by medical personnel, the corrections officer must be female if practicable").

In this case, the Plaintiff identifies three deputies who were allegedly in the delivery room when she gave birth—two male deputies and one female deputy. The Plaintiff alleges that Deputy Haskell and Deputy Dickey, both male corrections officers, were "present in the labor and delivery room without Plaintiff's permission during the birth of her child." Compl. ¶ 59. She also alleges that Deputy Dickey and Deputy Brady saw her naked and exposed body,[13] Compl ¶ 57, and she contends that she "did not pose a security risk or danger to anyone," Compl. ¶ 61. As discussed above, precedent from the First Circuit and other circuits indicates that such viewing of an inmate's naked body by officers of the opposite sex can violate clearly established law, particularly when there are no exigent circumstances or penological

---

[13]    Although the Plaintiff does not specifically allege that Deputy Haskell ever saw her exposed body, she does allege that he was in the delivery room during the birth of her child. Compl. ¶ 59. Given the nature of childbirth and the dearth of facts about the layout of the delivery room, I find it difficult to distinguish between these two male deputies at this stage of the proceeding.

justifications. And other courts have extended this rule to officers of the same sex.[14]

Here, the Plaintiff does not merely allege that the officers saw brief glimpses of her naked body. Rather, she alleges that—over the course of twenty hours—the officers were present in her hospital room during the highly intimate act of childbirth, while she had little opportunity or control to shield her body or protect her privacy.

To be sure, at this early stage, the facts regarding the extent and intrusiveness of the deputies' conduct are limited and thus it is difficult to fully assess their conduct. They may still be entitled to qualified immunity if the facts show that their conduct did not violate clearly established law. *Mills v. City of Barbourville*, 389 F.3d 568, 579 (6th Cir. 2004) (on motion for summary judgment, holding that officer was entitled to qualified immunity for accidentally walking past female arrestee when she was being searched and her breasts were exposed, but noting that if the officer "planned or intended to see her during the search, he would not be entitled to qualified immunity"). At the motion to dismiss stage, however, I accept the allegations in the Complaint as true and draw any inferences in the light most favorable to the Plaintiff. Those inferences suggest that Deputies Haskell, Dickey, and Brady placed themselves in a position to observe the Plaintiff's naked body during the course of her twenty hours of labor and without any readily apparent penological justification or exigent circumstances. *Ashann-Ra v. Virginia*, 112 F. Supp. 2d 559, 565 (W.D. Va. 2000) (at summary judgment stage, concluding that court was "unable to hold that

---

[14]     I recognize that it may be more difficult for the Plaintiff to prove that Deputy Brady, who is female, violated clearly established law. However, at this point, the Defendants have not argued that the deputies' conduct should be viewed differently based on their sex.

the defendants reasonably believed that they were not violating one of the plaintiff's 'clearly established' constitutional rights" where female correctional officers were able to view inmates showering). Thus, I conclude that dismissal of the § 1983 claims against them is not warranted.

## II.  Supervisory Liability – Claims against Joyce and Kortes

The Plaintiff alleges that Sheriff Joyce and Major Kortes are both responsible for the training and supervision of the named Defendant deputies, and she asserts that the "constitutional and statutory violations of Plaintiff's rights committed by all other Defendants were caused by the acts and/or omissions of Defendant[s] Joyce [and Kortes], including, but not limited to, [their] grossly negligent policies, customs and/or pattern of practice in recruitment, training, supervision, and discipline of all other Defendants." Compl. ¶¶ 116–17, 120–21. The Defendants assert that these claims should be dismissed because the Plaintiff does not allege that either Sheriff Joyce or Major Kortes was aware of prior instances in which pregnant inmates were handcuffed or officers were present in the delivery room when an inmate gave birth and she does not even allege that the latter has ever occurred before. Defs.' Mot. 12–13.

Generally, a supervisor's liability under § 1983 " 'must be premised on his or her own acts and omissions' and does not attach automatically even if a subordinate is found liable." *Justiniano v. Walker*, 986 F.3d 11, 20 (1st Cir. 2021) (quoting *Guadalupe-Báez*, 819 F.3d at 515). "To connect the liability dots successfully between supervisor and subordinate," a plaintiff must show two things: (1) "that one of the supervisor's subordinates abridged the plaintiff's constitutional rights" and (2) "that

the supervisor's (in)action 'was affirmatively linked to that behavior in the sense that it could be characterized as gross negligence amounting to deliberate indifference.' " *Id.* (quoting *Guadalupe-Báez*, 819 F.3d at 514–15). Deliberate indifference, which Ms. Brown alleges both Sheriff Joyce and Major Kortes showed here, in turn requires a plaintiff to allege "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Id.* (quoting *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998). But, as the First Circuit has stressed, deliberate indifference alone "does not equate with supervisory liability" because there must also be a solid "causal link between a supervisor's conduct and the constitutional violation." *Guadalupe-Báez*, 819 F.3d at 515 (quoting *Figueroa–Torres v. Toledo–Dávila*, 232 F.3d 270, 279 (1st Cir. 2000)). The First Circuit has also "cautioned that 'the liability criteria for failure to train claims are exceptionally stringent.' " *Justiniano*, 986 F.3d at 20 (quoting *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998)).

Ms. Brown alleges that staff at CCJ had previously handcuffed pregnant inmates. Compl. ¶ 50. She also alleges that officers from the jail "were freely coming and going from [her delivery] room[,] using their cell phones, joking that [she] should name her child after the jail[,] and drinking coffee." Compl. ¶ 58. She states that Sheriff Joyce is "responsible for the training, supervision, and conduct" of the Defendant officers; that he is "responsible for enforcing the regulations of the Cumberland County Sheriff's Department, making and enforcing police department policies that protect the constitutional rights of citizens, and for ensuring that the

21

correctional officers of the [CCJ] obey" federal and state laws; and that he is "responsible for ensuring that all inmates received appropriate medical care in compliance with" federal and state law. Compl ¶¶ 9–11; *see also* Compl. ¶ 63 ("Defendant Joyce is the chief policy maker for the Cumberland County's Sheriff's Department."). She asserts that Sheriff Joyce "failed in his duty to either train or supervise the [correctional officer Defendants]," Compl. ¶ 64, and she alleges that the violations of her constitutional and statutory rights "committed by all other Defendants were caused by the acts and/or omission of Defendant Joyce, including, but not limited to, his grossly negligent policies, customs and/or pattern of practice in recruitment, training, supervision, and discipline of all other Defendants." Compl. ¶ 117. The Plaintiff adds that Sheriff Joyce's "acts and/or omissions amount to deliberate, reckless or callous indifference to the constitutional rights of others, including Plaintiff." Compl. ¶ 118. Her allegations regarding Major Kortes are essentially identical. *See* Compl. ¶¶ 16–18, 65–66, 121–22.

Although the Complaint is short on specifics—particularly regarding Sheriff Joyce's and Major Kortes's liability in connection with the handcuffing incident[15]—certain inferences can be drawn from what the Plaintiff does allege. From the allegations that multiple officers nonchalantly joked and drank coffee in the labor and delivery room, I can infer that those officers were not trained about how to handle

---

[15]    The Plaintiff briefly alleges that her handcuffing incident "was not the first time" deputies at the jail handcuffed a pregnant inmate, Compl. ¶ 50, but she does not allege when such other violations occurred, who was involved, or even how many other such incidents there were. And she does not allege that either Sheriff Joyce or Major Kortes had any knowledge about such incidents. In fact, the Plaintiff concedes that Sheriff Joyce "was not made aware of the incident" where she was handcuffed until February of 2019 when Plaintiff's counsel alerted him. Compl. ¶ 49.

pregnant inmates or about their duties under state law. That other officers came and went throughout her labor allows me to infer that none of the officers understood that the deputies in the labor and delivery room were violating state law, suggesting that the lack of training was widespread. Finally, the allegation that multiple corrections officers were coming and going during the twenty-hour labor allows me to infer that supervisors were coordinating the assignment of officers and were at least generally aware of the situation.

To hold Sheriff Joyce and Major Kortes liable, the Plaintiff will have to show that these officials' actions "evince[d] reckless or callous indifference to the constitutional rights of others," and "mere negligence will not suffice." *Justiniano*, 986 F.3d at 20 (quoting *Guadalupe-Báez*, 819 F.3d at 515); *see also Guadalupe-Báez*, 819 F.3d at 516 (explaining that the "supervisor must be on notice"—either actual or constructive—of the violation (citations omitted)). The Plaintiff will also have to establish their "conduct led inexorably to the constitutional violation." *Id.* at 515 (quoting *Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1380 (1st Cir. 1995)).

But at the pleading stage, it is unlikely that the Plaintiff has access to any information about similar incidents. If female inmates are sent to the hospital to have their babies, other female inmates are not in a position to observe how they are guarded. And, for a variety of reasons, female inmates might not wish to go public with their own childbirth stories. The Defendants, on the other hand, are in a better position to know about the treatment of other pregnant inmates. Indeed, they are required by state law to keep records pertaining to pregnant inmates. *See* 30-A M.R.S.

23

§ 1660(4).[16] In such cases, the First Circuit has instructed that " 'some latitude may be appropriate' in applying the plausibility standard." *Saldivar v. Racine*, 818 F.3d 14, 23 (1st Cir. 2016) (quoting *García–Catalán v. United States*, 734 F.3d 100, 104 (1st Cir. 2013)); *see also Murphy v. Baker*, No. 17-30021-MGM, 2019 WL 1437825, at *4 (D. Mass. Mar. 29, 2019) (concluding that, though plaintiff's complaint was "couched in general terms," it "contain[ed] sufficient factual content to survive a motion to dismiss," particularly because the defendants "possess[ed] information that [was] otherwise beyond Plaintiff's reach but is necessary to prove his claims" (quotations omitted)). And the First Circuit has reiterated that "the plausibility inquiry properly takes into account whether discovery can reasonably be expected to fill any holes in the pleader's case," thus explaining that dismissal may not be warranted when "it is reasonable to expect that modest discovery may provide the missing link that will allow the [plaintiff] to go to trial on her claim." *García–Catalán*, 734 F.3d at 104–05 (internal quotations omitted).

It is certainly possible that, after discovery, the facts will reveal that Sheriff Joyce and Major Kortes were unaware of the actions of the correctional officers or that the Plaintiff's experience was an isolated incident not caused by the supervisors' action or inaction. But at this stage, given the nature of the Plaintiff's claims, I conclude that her claims against these supervisors should survive dismissal. *See Murphy*, 2019 WL 1437825, at *4 (stating that the question at the motion to dismiss

---

[16]     The Plaintiff has alleged that Lieutenant Brady failed to note in his report of the Plaintiff's transfer back to the main jail that she was handcuffed.

stage "is whether [the plaintiff] has alleged facts that paint a 'plausible picture' and if proven would support a finding of individual liability" (quoting *Haley*, 657 F.3d at 52)).

### III.       Municipal Liability – Claim against Cumberland County

As with the claims against Sheriff Joyce and Major Kortes, the Defendants contend that the Complaint fails to state a claim against Cumberland County because it does not allege a widespread practice of handcuffing pregnant inmates and because its allegations regarding the officers' presence in the delivery room "relate only to a discrete, one-time event." Defs.' Mot. 13.

In § 1983 suits, a municipality may be liable "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (*quoting Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978)). But municipalities "are not vicariously liable under § 1983 for their employees' actions." *Id.* Rather, they "are responsible only for 'their *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, a plaintiff who seeks to impose § 1983 liability on a municipality—like Cumberland County—must prove that municipal employees acted pursuant to official policy or custom in causing her injury. *See id.*; *see also Saldivar*, 818 F.3d at 19–20.

"A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused . . . by a person with final policymaking

authority."[17] *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008). She can establish the existence of a municipal custom by identifying a practice that is "so well-settled and widespread that the policy making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end" the practice. *Walden v. City of Providence*, 596 F.3d 38, 57–58 (1st Cir. 2010) (quoting *Bisbal–Ramos v. City of Mayagüez*, 467 F.3d 16, 24 (1st Cir. 2006)); *see also Connick*, 563 U.S. at 61 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."). In some "limited circumstances," a municipality's "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61.

The Plaintiff alleges that "Defendant Cumberland County is also responsible for the training and supervision of the correctional officers and failed in its duty to either train or supervise the Defendants." Compl. ¶ 67. She further asserts that Cumberland County "has a pattern and practice of failing to . . . adequately train and supervise police officers as they are constitutionally required." Compl. ¶ 68. The Plaintiff then alleges that the "policy, customs and practices of Cumberland County and its policy makers comprise the cause of and the moving force behind the

---

[17]     There is an overlap between municipal liability and supervisory liability because the former is based on the decisions of policymakers, who are often also supervisors. *See Quinn v. US Prisoner Transp. Inc.*, No. 2:18-cv-00149-DBH, 2019 WL 257980, at *8 (D. Me. Jan. 17, 2019), *report and recommendation adopted*, No. 2:18-cv-149-DBH, 2019 WL 1474389 (D. Me. Apr. 3, 2019).

constitutional violations at issue in this complaint." Compl. ¶ 124. She adds that the County's "policies and customs caused the deprivation" of her constitutional and statutory rights and "are tantamount to reckless, callous, or deliberate indifference" to her rights. Compl. ¶ 127.

As with the supervisory liability claims, I acknowledge that the Plaintiff's allegations are scarce on details, particularly details about municipal policymakers exuding deliberate indifference to the risk of harm to her. But, again, she is likely not in a position to access or know facts about other possible instances in which officers were present during an inmate's childbirth. *See García–Catalán*, 734 F.3d at 104–05. At this stage, then, it is hard to see how she could piece together other possible instances in order to show that there was a pattern or practice amongst officers.[18] What she has pleaded, however, suggests that Cumberland County employees were potentially uninformed about the proper treatment of pregnant inmates under federal and state law, poorly trained about their duties, or part of a culture of indifference about how to treat pregnant inmates. While she has not alleged that other pregnant inmates had similar experiences, her allegations involve multiple CCJ officers. And from her allegations, it appears that no officers at the hospital had

---

[18]    I see a difference between the handcuffing incident and the presence of the officers at the birth of the Plaintiff's child. For example, the Plaintiff indicates that CCJ had a policy *against* handcuffing pregnant inmates. *See* Compl. ¶ 47 (alleging that "Defendant Renna realized he had violated jail policy, but not the statute, by handcuffing Plaintiff and reported this matter to Lt. Brady"); *see also Abdisamad*, 960 F.3d at 60–61 (holding that complaint failed to allege a municipal policy or custom where it "include[d] no facts whatsoever about a [city] policy that would be unconstitutional" and instead alleged that child's death resulted from defendants' failure to follow their own protocols). But the Plaintiff has only asserted one municipal liability claim against Cumberland County, and because I conclude that she has sufficiently alleged a claim stemming from the presence of the officers in the delivery room, I will not parse that claim based on different grounds or theories of liability.

any qualms about being present in the delivery room when she gave birth—or about any of the other officers being present either. *See* Compl. ¶¶ 54, 58 (alleging that multiple officers "were freely coming and going from [her delivery] room," using their cell phones, and making jokes over the course of the twenty hours that she was in labor). Her Complaint thus paints a plausible picture that Cumberland County had a custom of disregarding pregnant inmates' rights or failed to properly train its employees with regard to those rights.

Although the Plaintiff will need to develop more facts in order to prevail on her claim against Cumberland County, I conclude that Count VIII should not be dismissed at this stage.

## IV.    MCRA Claim

In Count XI, the Plaintiff asserts that the Defendants violated the MCRA when they "intentionally attempted to interfere with the exercise and enjoyment of Plaintiff's rights." Compl. ¶ 130. The MCRA's "protections and immunities are generally 'coextensive with those afforded by 42 U.S.C. § 1983.' " *Johnson v. City of Biddeford*, 454 F. Supp. 3d 75, 92 (D. Me. 2020) (quoting *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178–79 (1st Cir. 2008)). Thus, because the § 1983 claim against Defendant Renna is dismissed, any claims against him that arise under the MCRA are dismissed as well. Count XI remains only as to the claims against Defendants Haskell, Dickey, Brady, Joyce, Kortes, and Cumberland County.

## V.    Section 1985 Claim

The Defendants argue that Count I—asserting a conspiracy to interfere with the Plaintiff's civil rights under 42 U.S.C. § 1985—should be dismissed because the

Plaintiff does not allege any type of agreement or conspiratorial purpose for either the handcuffing incident or the presence of officers in the delivery room. Defs.' Mot. 15 (adding that "there are no allegations that would permit the court to infer an agreement, motivated by some discriminatory animus, among the Defendants to deprive [the Plaintiff] of her constitutional rights").

In a few sentences, the Plaintiff responds that the conspiracy claim should not be dismissed because "Defendant Officers discussed the fact that they were present in her labor and delivery room, and one of the officers confirmed that they did not have to be present in the room, yet they continued to come and go in violation of her above-enumerated rights."[19] Pl.'s Opp'n 13 (adding that the "Defendants knew they were violating her right to privacy and agreed to continue to do so").

"Section 1985 provides a remedy for acts of civil conspiracy in which two or more individuals conspire for the purpose of depriving another of rights or privileges accorded to them by law." *Alston v. Spiegel*, 988 F.3d 564, 577 (1st Cir. 2021) (citing 42 U.S.C. § 1985). To plead an actionable claim under this statute, a plaintiff "must allege the existence of a conspiracy, allege that the purpose of the conspiracy is to deprive the plaintiff of the equal protection of the laws, describe at least one overt act in furtherance of the conspiracy, and show either injury to person or property, or a deprivation of a constitutionally protected right." *Id.* (internal quotations and citation omitted). To adequately plead the existence of a conspiracy "a plaintiff must plausibly

---

[19]     Nowhere in the Complaint does the Plaintiff allege that one of the officers confirmed that they did not have to be present in the delivery room.

allege facts indicating an agreement among the conspirators to deprive the plaintiff of [her] civil rights" or "plausible factual allegations sufficient to support a reasonable inference that such an agreement was made." *Id.* at 577–78 (internal quotations and citation omitted). Put simply, "[v]ague and conclusory allegations about persons working together, with scant specifics as to the nature of their joint effort or the formation of their agreement, will not suffice to defeat a motion to dismiss." *Id.* at 578 (citing *Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019)).

Like the plaintiff in *Alston*, Ms. Brown's Complaint offers vague allegations and scant specifics. It alleges no facts suggesting a conspiratorial agreement or purpose. Although a court can infer that an agreement was made when direct evidence is lacking, such an inference must still be based on sufficient and plausible factual allegations. Ms. Brown alleges that the actions of Lieutenant Brady, "in covering up for the violations of Defendant Renna," and "the failure to train and supervise officers regarding their obligations for treatment of pregnant inmates are specific acts done in concert in furtherance of this conspiracy." Compl. ¶ 72. But even if those actions were done with the purpose of violating the Plaintiff's constitutional rights,[20] she still alleges no facts suggesting the existence of an agreement. On the first "specific act[ ]," she merely alleges that Lieutenant Brady—who is not named as a defendant in this case—"failed to make his supervisors aware of Defendant Renna's

---

[20]    Importantly, the crux of the Plaintiff's claim regarding her handcuffing was that the act itself violated her constitutional rights. It is unclear if she is also asserting that the alleged coverup of that incident also violated her constitutional rights, particularly because she does not assert any claims against Lieutenant Brady whom she credits with "sign[ing] off on an inaccurate report of [her] transfer back to the main jail by failing to note that handcuffs were applied to [her]." Compl. ¶ 48.

violation and signed off on an inaccurate report." Compl. ¶ 48. She does not allege any facts suggesting that there was an agreement amongst the Defendants to omit information from the report, let alone any facts suggesting that the purpose of such an agreement was to violate her constitutional rights. For the second "specific act[ ]," the alleged failure to train and supervise officers in the treatment of pregnant inmates, the same deficiencies exist, but the Complaint also fails to even identify which Defendants supposedly conspired. *See* Compl. ¶ 72. These vague allegations and legal conclusions about the existence of a conspiracy are insufficient. "A pleader is entitled to have reasonable inferences drawn in his favor, but he is not entitled to the benefit of speculation unanchored to sufficiently supportive facts." *Alston*, 988 F.3d at 578; *see also Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 307 (D. Mass. 2017) ("The plaintiffs cannot defeat a motion to dismiss based on conclusory allegations of conspiracy that are not supported by references to material facts. The plaintiffs plead no facts to support the existence of an agreement between parties to violate their federal constitutional rights, so they fail to cross the plausibility threshold."). Thus, Count I is dismissed.

**VI.    State Civil Conspiracy Claim**

The Defendants also argue that Count X—which raises a civil conspiracy claim under state law—should be dismissed. They note that "civil conspiracy" is not an independent tort in Maine, but rather must be tied to other tort claims, and point out that the Plaintiff asserts no other tort claim in this action. Defs.' Mot. 15–16. The Plaintiff does not address this specific point in her opposition. Instead, she states that

the Complaint sufficiently pleaded the elements of her "conspiracy claim," without specifying the conspiracy claim to which she is refers. Pl.'s Opp'n 13.

The Defendants are correct that because civil conspiracy is not an independent tort under state law, "liability ordinarily may not be imposed on this basis alone." *Johnson*, 454 F. Supp. 3d at 93 (citing *Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 176 & n.18 (D. Me. 2007)); *see also Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 8, 708 A.2d 283, 286 (Me. 1998). By not asserting any other tort claim, the Plaintiff has failed to properly assert a civil conspiracy claim. Moreover, as with her § 1985 claim, her civil conspiracy claim is also insufficient because she fails to allege facts that would establish the elements of such a state law claim. *See Johnson*, 454 F. Supp. 3d at 93 (explaining that the elements of a civil conspiracy claim under Maine law are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful acts; and (5) damages" (quoting *Smith v. Coyne*, No. CV-03-405, 2004 WL 1433638, at *4 (Me. Super. Ct. Apr. 12, 2004))). For example, there are no facts in the Complaint suggesting that there was a "meeting of minds" among any Defendants. Thus, Count X is also dismissed.

## VII.   Claim Under 30-A M.R.S. § 1582

The Defendants argue that Count IX should be dismissed because there is no express private right of action under 30-A M.R.S. § 1582. Defs.' Mot. 14–15.

The Law Court has explained that "[a] statute may provide for a private right of action by express language or by implication." *Wawenock, LLC. v. Dep't of Transp.*, 2018 ME 83, ¶ 5, 187 A.3d 609, 612 (Me. 2018). But it has also stated that a private

right of action is most commonly found from express language, emphasizing that if the Legislature "had intended that a private party have a right of action, it would have either expressed its intent in the statutory language or legislative history or, more likely, expressly enacted one." *Id.* (quotation omitted); *see also Charlton v. Town of Oxford*, 2001 ME 104, ¶ 15, 774 A.2d 366, 372 (Me. 2001) ("We are hesitant to imply a private right of action where the legislature has not expressly stated that a cause of action exists."). When assessing whether a private right of action may be implied, the Law Court examines: "(1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one; (3) whether it is consistent with the underlying legislative scheme to imply such a remedy; and (4) whether the cause of action is one traditionally relegated to one jurisdiction rather than another." *Goodwin v. Sch. Admin. Dist. No. 35*, 1998 ME 263, ¶ 12, 721 A.2d 642, 646 (Me. 1998) (citation omitted).

The Plaintiff does not appear to assert that § 1582 contains an express private right of action, nor do I see one in the statute. Rather, in her opposition, the Plaintiff seems to argue that there is an implied private right of action in § 1582. *See* Pl.'s Opp'n 11–13. First, the Plaintiff contends that § 1582 must have done more than just set a policy because jails were already required to promulgate policies and similar policies were already being drafted when the provision was enacted. Thus, it would render this statute superfluous to conclude that there was no private right of action. Second, the Plaintiff argues that, "[i]f the court does not construe the statute as

conferring a private right of action, there is no enforcement mechanism to a violation of this statute," adding that concluding " the legislature would enact a superfluous statute violates the canons of statutory construction." Pl.'s Opp'n 12–13.

Neither of the Plaintiff's arguments identifies any grounds for finding a private right of action in the statute or in its legislative history. Her first argument does not identify any clear indication of legislative intent to authorize private individuals to enforce § 1582. As to her second argument, the Law Court has rejected the notion that "the mere presence of the words 'must' and 'shall' in a statute . . . mean[s] that a private right of action exists to enforce it." *Wawenock*, 2018 ME 83, ¶ 9, 187 A.3d at 615. And, although I recognize that § 1582 was likely enacted to benefit individuals such as the Plaintiff, a pregnant inmate, there still must be some "indication of legislative intent to create . . . a private remedy" and "the existence of such a remedy [must be] consistent with the underlying purpose of the legislative scheme." *In re Wage Payment Litig.*, 2000 ME 162, ¶ 8, 759 A.2d 217, 222 (Me. 2000).

The Plaintiff is requesting that I find a private right of action in a state statute—a question that the Law Court has not yet addressed. It is generally not the role of federal courts to make new state law or expand state law. *See Jordan v. Hawker Dayton Corp.*, 62 F.3d 29, 32 (1st Cir. 1995); *Pimentel v. City of Methuen*, 323 F. Supp. 3d 255, 274 (D. Mass. 2018) ("[I]t is emphatically not the role of the federal courts to develop and expand upon state law. If this Court were to conclude that such a right existed, no Massachusetts court would have an opportunity to consider that decision—including, among other things, an opportunity to consider the wisdom of

the policy embedded in such a decision and the potential consequences for litigants and the courts."); *Dionne v. Amatucci*, Civil No. 10–cv–230–PB, 2011 WL 4915550, at *7 (D.N.H. Oct. 17, 2011) ("Litigants who choose a federal forum . . . cannot expect a federal court to push the boundaries of state law.")

Given the lack of evidence that the Maine Legislature intended to create a private right of action and the novelty of this state law question, I decline to exercise supplemental jurisdiction over Count IX. *See* 28 U.S.C. § 1367 ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel or complex issue of State law . . . ."). Count IX is thus dismissed.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motion to dismiss (ECF No. 8). Counts I–II and IX–X are **DISMISSED**. Counts III–VIII, and XI[21] are not dismissed.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 18th day of August, 2021.

---

[21]    Any claim against Defendant Renna under Count XI is dismissed.